```
                UNITED STATES DISTRICT COURT          FILED
                NORTHERN DISTRICT OF ALABAMA
                    NORTHEASTERN DIVISION           00 AUG 25 PM 2:07

                                                    U.S. DISTRICT COURT
EDDY J. BURKS,                    )                 N.D. OF ALABAMA
                                  )
     Appellant,                   )
                                  )
vs.                               )  Civil Action No. CV-00-S-0885-NE
                                  )
STATE OF LOUISIANA                )
BOARD OF REGENTS                  )                  ENTERED
                                  )
     Appellee.                    )                  AUG 2 5 2000
```

## MEMORANDUM OPINION

This action is on appeal from a judgment entered by the United States Bankruptcy Court for the Northern District of Alabama. Jurisdiction is predicated upon 28 U.S.C. § 158.[1] Upon consideration of the record, briefs, and documents submitted by the parties, this court affirms.[2]

### BACKGROUND

Appellant, Eddy Burks ("Burks"), pursued a graduate degree[3] in business administration at Louisiana Tech University from 1983 through 1986. His study was subsidized by a series of three $10,000 "stipends" awarded at the beginning of each academic year

---

[1] 28 U.S.C. § 158 provides that district courts "shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges."

[2] The bankruptcy court's conclusions of law are reviewed *de novo*. *See, e.g., Nordberg v. Arab Banking Corp.*, 904 F.2d 588, 593 (11th Cir. 1990); *Prestwood v. United States (In re Prestwood)*, 185 B.R. 358, 360 (M.D. Ala. 1995).

[3] The record does not clearly specify whether appellant was pursuing a Master's or Doctorate; even so, the use of the phrase "terminal degree" in the parties' agreements leads this court to believe it was the latter.



by the appellee, the Louisiana Board of Regents ("the Board"), pursuant to a "Graduate Fellowship Program." In return, Burks obligated himself to teach for three years at "other-race" institutions of higher learning in Louisiana.

> Recipient agrees that upon completion of [his] study under the Program and/or conferral of the terminal degree [he] will be available to teach for a minimum of three years at a Louisiana public institution of higher education at which [he] would be an other-race faculty member (i.e., a white faculty member at a predominantly black institution[,] or a black faculty member at a predominantly white institution).[4]

Burks further agreed that, if he failed to fulfill his teaching commitment, he would reimburse the stipends plus interest.

> Recipient agrees to repay the stipends received in full plus legal interest from the date of receipt of these funds until paid in full if [he] willfully fails to teach for the full three-year period either following completion of [his] study under the Program or following attainment of the terminal degree.[5]

Burks neither fulfilled his teaching obligation nor repaid the money awarded by the Board.

Burks filed for bankruptcy relief under Chapter 13 on February 2, 1999. He instituted an adversary proceeding against the Board on August 23, 1999, asking the bankruptcy court to determine that his debt — which, by that date, had swollen to $98,167.42, due to

---

[4] See paragraph 7 of the agreements executed by the parties on June 29, 1983, July 23, 1984, and July 29, 1985.

[5] *Id.*, ¶8.

the accumulation of interest and other charges — was dischargeable under 11 U.S.C. § 523(a)(8). The court entered judgment in favor of the Board, and this appeal followed.

## DISCUSSION

Congress created the Bankruptcy Code to provide debtors "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). Even so, Congress excluded certain obligations from that general discharge policy. Student loans constitute one such exemption.

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ... (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8). Congress attached the original version of that section to the Bankruptcy Code during 1978, in "response to concerns about the escalation in the default rate of student

loans." *A.L. Lee Memorial Hospital v. McFadyen (In re McFadyen)*, 192 B.R. 328, 331 (Bankr. N.D.N.Y. 1995). The legislative history

> teaches that the exclusion of educational loans from the discharge provisions was designed to remedy abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing for bankruptcy shortly after graduation, and to safeguard the financial integrity of educational loan programs. ... By enacting section 523(a)(8), Congress sought principally to protect governmental entities and nonprofit institutions of higher education — places which lent money or guarantee loans to individuals for educational purposes — from bankruptcy discharge. Because such loans are not based upon a borrower's proven credit-worthiness, and because they serve a purpose which Congress sought to encourage, section 523(a)(8) protects the lender when a borrower, who often would not qualify under traditional underwriting standards, files ... bankruptcy. ...

*In re Segal*, 57 F.3d 342, 348 (3rd Cir. 1995) (citations omitted); *see also, e.g., In re Pilcher*, 149 B.R. 595, 598 (9th Cir. 1993) (observing that § 523(a)(8) was enacted for the purpose of "curb[ing] the abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing bankruptcy shortly after graduation, and to safeguard the financial integrity of educational loan programs").

The present version of § 523(a)(8) is comprised by a series of disjunctive statements[6] defining the categories of student debts

---

[6] Each independent clause reflects additions made by Congress at various times to expand the coverage of the statute. For a summary of the various amendments from 1978 to the present version of § 523(a)(8), see, *e.g., In re*

4

that may not be absolved in bankruptcy: thus, (i) "an educational ... loan made ... by a governmental unit" may not be discharged; <u>or</u> (ii) "an educational ... loan ... made under any program funded in whole or in part by a governmental unit" may not be discharged; <u>or</u> (iii) "an obligation to repay funds received as an educational benefit, scholarship or stipend" may not be discharged.

Burks does not dispute that the Board is a "governmental unit," nor could he.[7] The prefatory paragraph of each agreement executed by Burks recites that the Board is "an agency of the State of Louisiana."[8] That conforms to 11 U.S.C. § 101(27), which defines the term "governmental unit" as including, among other things, a "department, agency, or instrumentality of ... a State...."

Instead, Burks argues that stipends were not awarded to him for an "educational purpose," but "for certain business considerations" of the Board[9] — considerations that he impugns with pejorative characterizations, such as "an experiment in social

---

Segal, 57 F.3d 342, 346-47 (3rd Cir. 1995), and A.L. Lee Memorial Hospital v. McFadyen (In re McFadyen), 192 B.R. 328, 331-32 (Bankr. N.D.N.Y. 1995).

[7] Burks also has not asserted that the disputed funds were not advanced to him "under any <u>program</u> funded in whole or in part by a governmental unit," or that "excepting [this] debt from discharge ... will impose an undue hardship on [him] and [his] dependents"; accordingly, there is no need to address those aspects of § 523(a)(8).

[8] See the agreements executed on June 29, 1983, July 23, 1984, and July 29, 1985.

[9] Brief of Appellant (doc. no. 4), at 9.

5

engineering"[10] in which "considerations of race were paramount,"[11] and, "a laboratory experiment" in which "guinea pigs" are "induced to run through a maze in order to get food."[12] Burks relies upon two non-binding decisions to support his base assertions: *i.e.*, *In re Segal*, 57 F.3d 342 (3rd Cir. 1995), and *A.L. Lee Memorial Hospital v. McFadyen* (*In re McFadyen*), 192 B.R. 328 (Bankr. N.D. N.Y. 1995). Neither case can bear the weight Burks places upon it. Rather, both decisions are distinguishable. Moreover, to the extent *McFadyen* contains language that arguably supports Burks' contentions, it is not persuasive.

The debtor in *Segal*, for example, signed a scholarship program contract with the National Health Service Corps ("NHSC") which allowed her to receive financial support for medical school tuition, but also caused her to incur an obligation to provide medical services for four years following graduation at a location designated by the NHSC. The scholarship contract also provided that, in lieu of performing medical services at an approved site, the debtor could satisfy her obligation to the NHSC by a cash payment. The debtor fulfilled all but 19 months of her four-year

---

[10] *Id.*, at 10.
[11] *Id.*, at 15.
[12] *Id.*, at 10.

6

obligation to the NHSC by practicing medicine in Jasper, Florida, an approved site. During that period, however, the debtor became affiliated with Lake Shore Hospital in Lake City, Florida. The owner of that hospital, Santa Fe HealthCare, Inc., loaned the debtor $182,619.17 to satisfy her financial obligation to the NHSC, in return for the debtor's commitment to immediately begin providing Obstetrics and Gynecological services to patients in the hospital's service area. *See In re Segal*, 57 F.3d at 344-45 & n.3. The debtor subsequently filed a petition for bankruptcy relief under Chapter 7. Santa Fe initiated an adversarial proceeding in the bankruptcy court, seeking a declaration that the loan it had made to the debtor to discharge her NHSC obligation was not dischargeable under § 523(a)(8). The Third Circuit held that "loans made pursuant to the terms of an employment contract which are used, in turn, to repay educational debt are not, themselves, non-dischargeable educational loans within the meaning of 11 U.S.C. § 523(a)(8)." *Id.*, at 350. En route to that conclusion, the *Segal* court observed that Santa Fe's loan had not facilitated the debtor's medical education, "which had long since been completed; instead, ... the purpose of the funds was to induce [the debtor] to accept employment with Santa Fe by providing her with a means to repay her obligation to the NHSC, an obligation which arose as a

7

result of a scholarship." *Id.* at 349. The court concluded that Santa Fe's loan had the "nature and character of a buyout," and that it was "made solely for the purpose of securing [the debtor's] services and, as such, cannot be fairly characterized as an educational loan or benefit." *Id.* Clearly, that is not the situation presented here. Moreover, the *Segal* decision in no way cast doubt on the applicability of § 523(a)(8) to the scholarship program contract requirements of governmental units such as the NHSC or the Louisiana Board of Regents.

The second case relied upon by Burks, *A.L. Lee Memorial Hospital v. McFadyen*, contains language which superficially appears to support his contentions on this appeal. There, while the debtor was enrolled in a course of study at Crouse Irving Memorial Hospital in Syracuse, New York, leading to a Registered Nurse certification, she entered into an employment contract with A.L. Lee Memorial Hospital ("Lee Memorial") located in Fulton, New York. "According to the terms of the Agreement, [Lee Memorial] agreed to pay Debtor's tuition for the completion of the R.N. program at Crouse Irving," and "Debtor in turn agreed to work for [Lee Memorial] for three years.... Debtor was required to reimburse [Lee Memorial] the $7,645 [advanced for the remainder of her

8

nursing course at Crouse Irving], plus 15% interest, in the event she terminated employment before the three years had elapsed." *McFayden*, 192 B.R. at 330. The debtor terminated her employment with Lee Memorial only three months after beginning, and filed a voluntary petition in bankruptcy. The hospital then initiated an adversary proceeding, seeking a determination that the loan it had made to the debtor for completion of her nursing education was not dischargeable under § 523(a)(8). The bankruptcy court held that the debt did not fall within any of the discharge exceptions for student loans because it was not intended "as an educational benefit to the Debtor, but rather it was intended to benefit [Lee Memorial] by assuring that it had a qualified nursing staff on a relatively long-term basis." *Id.*, at 333. This court does not find the foregoing language from *McFadyen* to be controlling.

Rather, close examination of both *Segal* and *McFadyen* reveals that each case is distinguishable from the situation presented here. In each case, the adversarial creditor was a private entity that had not initially extended student loans to the debtor, but instead had paid-off the debtor's educational debts in return for immediate employment of the debtor. It is a difficult stretch to compare the Louisiana Board of Regents, a governmental unit that originally advanced stipends to Burks at the beginning of each

academic year for the completion of his graduate studies, to the creditors in *Segal* and *McFadyen*.

In granting summary judgment for the Board, the bankruptcy court below found the stipends awarded Burks to be "substantially analogous to ... federal programs (such as the National Health Service Corps Scholarship Program and the Physician Shortage Area Scholarship Program) containing similar post-education work requirements."[13] This court agrees. For example, the case of *United States Department of Health and Human Services v. Vretis (In re Vretis)*, 56 B.R. 156 (Bankr. M.D. Fla. 1985), was an adversarial proceeding involving a debtor who had received financial assistance from the Public Health and National Health Service Corps Scholarship Training Program to complete his educational requirements for a degree in Osteopathic Medicine. In exchange, the debtor

> agreed to serve on active duty for at least two years as a member of the National Health Services Corps in a designated health manpower shortage area. If debtor failed to fulfill the service obligation then he agreed to pay in full within three years the total amount of the award plus interest running from the date the award was given.

*Id.* In a familiar scenario, the debtor declined to fulfill his service obligation and sought to discharge his alternative

---

[13] *See* Judgment entered on February 2, 2000, at 1.

10

financial obligation in bankruptcy. The debtor in *Vretis*, like Burks herein, argued that the financial assistance he had received was not an "educational loan" within the meaning of § 523(a)(8). The bankruptcy court rejected that contention, saying that "[t]he test for determining whether an award is an educational loan under § 523(a) is 'whether the funds were for educational purposes.'" *Id.*, at 157 (quoting *In re Shipman*, 33 B.R. 80 (Bankr. W.D. Mo. 1983)). The *Vretis* court then found that the financial assistance extended to the debtor was specifically "designated for tuition and educational purposes," and held that "the initial characterization of the loan is what controls." *Id.*

> The stipend given debtor was designated as monies to support debtor while engaged in academic training.... <u>The fact that the obligations under the award could be discharged by either service or by payment does not change its initial character of being for educational purposes</u>.

*Id.* (emphasis supplied).

The Eighth Circuit's decision in *United States Department of Health and Human Services v. Smith*, 807 F.2d 122 (8th Cir. 1986), is to the same effect, holding that a deadbeat doctor's attempted discharge of his obligation to either practice medicine in a designated area for a period of time following graduation, or repay the scholarship granted under the Physician Shortage Area

11

Scholarship Program[14] to finance his medical training, "was a nondischargeable 'educational loan' within the meaning of § 523(a)(8)." *Id.* In reaching that conclusion, the Eighth Circuit rejected the debtor's contention that his "scholarship was not a 'loan' since his obligation to reimburse the United States was not 'absolute,' ... but rather was contingent on his failure to practice in a physician shortage area." *Id.*, at 125 (citation and internal quotation marks omitted). The *Smith* court "follow[ed] the weight of authority that '[a] loan is no less a loan because its repayment is made contingent'" upon the debtor's performance or non-performance of a promise to perform a specified service of social importance to the governmental unit that advanced funds to finance a portion of the recipient's graduate study. *Id.*; *see also, e.g., Rural Kentucky Medical Scholarship Fund, Inc. v. Lipps (In re Lipps)*, 79 B.R. 67, 70 (Bankr. M.D. Fla. 1987) (holding that loans extended "to students to pay for educational expenses in exchange for an agreement to fulfill a particular service obligation, or in the alternative, repayment plus interest" are not dischargeable under § 523(a)(8)).

## CONCLUSION

The agreements executed by Burks expressly provide that the

---

[14] *See* 42 U.S.C. § 295g-21.

stipends advanced to him by the Board were for educational purposes: that is, "in support of work toward completion of the terminal degree in the field or discipline hereinabove designated."[15] That initial characterization of those loans is controlling, and the fact that Burks' obligations under his agreements could be discharged either by service to the state or by payment does not change that conclusion. Accordingly, the debt of appellant to the Board is not dischargeable under 11 U.S.C. § 523(a)(8), and the decision of the United States Bankruptcy Court for the Northern District of Alabama is due to be affirmed. An appropriate order shall be entered contemporaneously herewith.

DONE this the **25th** day of August, 2000.

_____
United States District Judge

---

[15] See paragraph 2 of the agreements executed by the parties on June 29, 1983, July 23, 1984, and July 29, 1985.